UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

| DORA LEE KROEGER | ) | |
|---|---|---|
| | ) | |
| V. | ) | NO. 2:11-CV-255 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | |

## REPORT AND RECOMMENDATION

The matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. Plaintiff's applications for disability insurance benefits and supplemental security income under the Social Security Act were denied following a hearing before an Administrative Law Judge ["ALJ"]. Both the plaintiff and the defendant Commissioner have filed dispositive Motions [Docs. 12 and 14].

The sole function of this Court in making this review is to determine whether the findings of the Secretary are supported by substantial evidence in the record. *McCormick v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Secretary's decision must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human*

*Services*, 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Ms. Kroeger was 48 years of age at the time of the ALJ's decision. She had a 10th grade, or "limited" education. She was unable to return to any of her past relevant work due to her severe impairments. These were, as found by the ALJ, morbid obesity, back and neck pain, degenerative joint disease in the left knee, bilateral shoulder arthritis, osteoarthritis of the hands, knees and first MTPS, anxiety and depression (Tr. 15].

Plaintiff's medical history is described by the defendant Commissioner in his brief as follows:

> The medical evidence reflects that Plaintiff was seen at The University Hospital in January 2008 in consultation for rheumatoid arthritis (Tr. 245-46). Yolanda Farhey, M.D., noted Plaintiff had an eight-year history of joint pain, joint stiffness, and joint swelling that began in her hands and feet and then occurred in her knees and shoulders (Tr. 245). Plaintiff was alert and oriented and was in no acute distress; she was well-appearing with a normal gait; and it was noted she was overweight (Tr. 245). Plaintiff's neck had good range of motion with no pain on motion (Tr. 246). Her shoulders showed mild impingement on the right side; her elbows were unremarkable; and her wrists showed trace swelling on the left side (Tr. 246). Plaintiff's knees showed bilateral crepitus with no tenderness or synovitis (Tr. 246). Plaintiff's ankles and feet were tender, but her muscle strength was normal proximally and distally (Tr. 246). Plaintiff exhibited tender points in 14 of 18 locations (Tr. 246). Dr. Farhey diagnosed osetoarthritis of the hands, knees, and first metatarsophalangeal joints (MTPs) in her foot; inflammatory arthritis; and fibromyalgia (Tr. 246).
> On January 30, 2008, three x-ray views of the hands and feet revealed in the right hand severe osteoarthrosis of the distal interphalangeal joints of the index and long fingers with mild arthrosis in the distal and proximal interphalangeal joints of the ring and small fingers (Tr. 243). There was severe arthrosis in the trapeziometacarpal joint (base of the thumb) as well (Tr. 243). In the left hand there was mild arthrosis in all of the distal interphalangeal joints, and there was moderate arthrosis in the trapeziometacarpal joint (Tr. 243). In the feet, there was mild

arthrosis in the first metatarsophalangeal joints (Tr. 243). There were plantar calcaneal spurs, bilaterally (Tr. 243). However, the radiologist saw no sign of inflammatory arthropathy in the hands or feet and only mild degenerative changes in the hands and feet (Tr. 243).

Plaintiff continued to follow-up at The University Hospital in April 2008 with complaints of joint pain in her hands, feet, knees, and shoulders (Tr. 242). Plaintiff was advised to lose weight, exercise, and stop smoking (Tr. 242). Plaintiff was to get a sleep study and continue taking her depression medication (Tr. 242).

In October 2008 Plaintiff reported left knee pain after she fell and twisted her knee (Tr. 259, 277). Plaintiff underwent an x-ray of her left knee that revealed moderate patella-femoral degenerative changes and at least mild to moderate medial joint space narrowing (Tr. 253). A magnetic resonance imaging (MRI) of Plaintiff's left knee revealed moderate tri-compartmental osteoarthritis; grade I/II sprain injury of the proximal medial collateral ligament; probable small complex tear versus focal degeneration along the inner aspect of the posterior horn medial meniscus at its junction with the posterior root ligament; possible early degenerative tear with peripheral displacement of the medial meniscus; and intense subchondral edema (swelling under cartilage) in the posterior medial tibial plateau which could be degenerative or traumatic (Tr. 252, 279).

In November 2008, Robert J. Hill, D.O. diagnosed degenerative joint disease of the left knee (Tr. 264). On November 11, 2008, Plaintiff underwent arthroscopic surgery of the left knee (Tr. 264). Plaintiff's first postoperative visit was November 19, 2008 (Tr. 276). Dr. Hill noted Plaintiff seemed to be doing okay, and the wound was clean and dry (Tr. 276). Dr. Hill removed the sutures as Plaintiff needed to take a bus (Tr. 276). Dr. Hill noted Plaintiff would begin exercises to strengthen her quads and hamstrings, and Plaintiff was to be seen "as needed" (Tr. 276).

On December 3, 2008, Plaintiff reported to Dr. Hill with left foot pain (Tr. 275). Dr. Hill noted swelling; however, sensory examination was unaffected (Tr. 275). Dr. Hill placed Plaintiff in a boot for protection; prescribed anti-inflammatories, and instructed her to limit her activity (Tr. 275). On April 29, 2009, Plaintiff reported no change in her left foot as it was still swollen and painful (Tr. 273). Home stretching did not seem to be helping (Tr. 273). Plaintiff received a prescription for Vicodin in May 2009 that was refilled in June 2009 (Tr. 273). On June 17, 2009, Plaintiff continued to complain of pain, soreness, and discomfort, although her range of motion was intact and sensory examination remained unaffected (Tr. 272). Plaintiff presented to Dr. Hill on June 24, 2009, with a diagnosis of mild osteoarthritis of metatarophalangeal joints two and three of Plaintiff's left foot (Tr. 302, 303-05). The decision was made to proceed with surgical fusion of the joints (Tr. 301, 303-05). The evidence shows Plaintiff steadily improved post surgery (Tr. 299-301), and on November 11, 2009, Dr. Hill observed Plaintiff was "doing quite well" (Tr. 299). Plaintiff's pain was decreasing and she was feeling a lot better (Tr. 299). Plaintiff was able to bear weight and ambulate without difficulty or problems (Tr. 299). Plaintiff was to return to Dr. Hill "as needed" (Tr. 299).

3

Consultative examiner Martin Fritzhand, M.D. examined Plaintiff on August 5, 2009 (Tr. 281-88). Dr. Fritzhand observed that Plaintiff was morbidly obese with longstanding musculoskeletal distress (Tr. 285-86). However, Plaintiff ambulated with a normal gait with only slight difficulty forward bending at the waist (Tr. 286). The was no evidence of nerve root damage as all sensory modalities were intact, and there was no evidence of muscle atrophy (Tr. 286-87). Dr. Fritzhand found Plaintiff to have well preserved bilateral grip strength and manipulative ability (Tr. 286, 287). Plaintiff was only able to squat to 50 percent of standard (Tr. 287). Lumbar spine x-ray report reflected moderate narrowing at L-5 and S-1, however the rest of the interspaces were normal and there were no compression fractures or scoliosis (Tr. 289). Dr. Fritzhand opined that Plaintiff appeared capable of performing a moderate amount of sitting, ambulating, standing, bending, pushing, pulling, lifting, and carrying heavy objects, although Plaintiff was unable to kneel (Tr. 287). Dr. Fritzhand observed that Plaintiff did not have any difficulty reaching, grasping, and handling objects (Tr. 287). Dr. Fritzhand found no visual and/or communicative limitations and no environmental limitations (Tr. 287).

State agency medical consultant William Bolz, M.D., reviewed the evidence on October 4, 2009 (Tr. 290-97). Dr. Bolz opined Plaintiff could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds; stand/walk at least 2 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and was unlimited in her ability to push and/or pull (Tr. 291). More specifically, Dr. Bolz opined Plaintiff could stand/walk 4 out of 8 hours due to degenerative joint disease (DJD), feet problems, back pain, and obesity (Tr. 291). Dr. Bolz further opined Plaintiff could occasionally climb ramps and stairs, balance, and stoop but could never climb ladders, ropes, and scaffolds, kneel, crouch, or crawl (Tr. 292). Dr. Bolz found Plaintiff limited to bilateral frequent handling and fingering due to her previous diagnosis of osteoarthritis of her hands (Tr. 293). Finally, Dr. Bolz opined Plaintiff should avoid concentrated exposure to hazards (Tr. 294).

Francis Florez, M.D., saw Plaintiff on December 23, 2009, for bilateral shoulder pain with more pain on the right side than on the left side (Tr. 319). Examination of Plaintiff's neck showed mild decreased range of motion and some tenderness to palpation but no instability (Tr. 319). Plaintiff's motor examination showed her trapezius, deltoids, biceps, triceps, wrist extensors and flexors and hand intrinsics to be intact, 4-5/5, equal and symmetrical (Tr. 319). Sensation and perfusion were intact to both right and left hands (Tr. 319). Examination of Plaintiff's shoulders, bilaterally, showed some pain with abduction and external rotation of both shoulders, but no shoulder instability (Tr. 319). Plaintiff also exhibited tenderness over the acromioclavicular (AC) joint (joint at the top of the shoulder), but no significant instability (Tr. 319). Dr. Florez noted that bilateral shoulder x-ray showed mild degenerative AC joint changes with some narrowing of bilateral acromiohumeral spaces, but no other obvious fractures, tumors or dislocations (Tr. 319). Plaintiff had some mild glenohumeral (ball and socket joint of the shoulder) arthritic changes (Tr. 319). Dr. Florez diagnosed mild bilateral shoulder arthritis with rotator cuff type symptoms and AC joint arthritis (Tr. 319).

4

A second state agency medical consultant, Gerald Klyop, M.D., reviewed the evidence on April 19, 2010, and affirmed Dr. Bolz's October 4, 2009 RFC (Tr. 349).

On December 29, 2010, Robert Locklear, M.D., saw Plaintiff for established care (Tr. 350-52). Plaintiff complained of arthritis in her knees, however, she was not taking any medication for arthritis (Tr. 350). Plaintiff reported she had taken Vicodin in the past for pain (Tr. 350). Dr. Locklear's physical examination revealed diffuse degenerative changes in Plaintiff's musculoskeletal system with no motor or sensory deficits (Tr. 351). Plaintiff was alert and oriented times three, and she exhibited no unusual anxiety or evidence of depression (Tr. 352). Dr. Locklear diagnosed benign hypertension, general osteoarthrosis, dyspnea (shortness of breath), stable depression, and rash (Tr. 352). Dr. Locklear prescribed Daypro for Plaintiff's osteoarthritis and scheduled a sleep study for Plaintiff's possible sleep apnea (Tr. 352). After the sleep study, on January 5, 2011, Plaintiff was diagnosed with insomnia with sleep apnea and obstructive sleep apnea (Tr. 354, 355).

[Doc. 15, pgs. 2-7].

At the administrative hearing, the ALJ asked Donna Bardsley, a vocational expert ["VE'], to assume "a 47 year old individual who has ten years of formal education in the work history which you which you have described. First of all, I'll ask you to assume the claimant is restricted to the demands of light work, which is work that requires the lifting of 20 pounds occasionally and 10 pounds frequently. I'll ask you to assume the claimant could do no jobs that required...repetitive gripping and grasping, she can only occasionally grip or grasp and she could do not job requiring overhead lifting with the right arm. If you ssume further that the claimant can do simple, routine jobs only....would there be jobs that the claimant could perform that exist in the regional and national economy?" The VE identified information clerks, with 200 in the region and 180,000 nationwide; order clerks, with 175 in the region and 150,000 nationwide; cashiers, with 400 in the region and 225,000 nationwide; sales clerks, with 700 in the region and 1,000,000 nationwide; and hostess with 300 in the region and 325,000 nationwide. When asked what jobs with these same restrictions except at the sedentary level, the VE identified cashiers, with 100 in the region

5

and 55,000 nationwide; information clerks with 75 in the region and 35,000 nationwide; and order clerks with 90 in the region and 65,000 nationwide. When asked by the plaintiff's counsel whether her answer would be altered as to the first hypothetical (at the light level of exertion) if the individual would have to have the option of alternating positions from sitting to standing, the VE said it would reduce the numbers "at least 50%." (Tr. 44-46).

In his hearing decision, the ALJ found that the plaintiff had the severe impairments recounted hereinabove. He then recounted the medical evidence in detail. He gave "great weight" to the opinions of the consultative examiners, Dr. Fritzhand and Dr. Berg. He gave "significant weight" to the treating physicians' opinions. He gave "some weight" to the opinions of the State Agency evaluators. (Tr. 22-23).

The ALJ opined that the plaintiff had" the residual functional capacity ["RFC"] to perform a limited range of light work...In addition, arthritis in her shoulder, hands and fingers precludes performing any tasks requiring repetitive gripping, grasping and no overhead reaching with her right arm. However, she can occasionally grip and grasp. Due to depression, she can only perform simple and routine type jobs." (Tr. 18)

He found that the plaintiff was not credible to the extent her testimony was inconsistent with the ALJ's RFC finding (Tr. 19).

Based upon the testimony of the VE, he found that there were a significant number of jobs which the plaintiff could perform with her RFC. Accordingly, he found that she was not disabled (Tr. 24-25).

Plaintiff raises several objections to the ALJ's decision to deny benefits. She asserts that the hypothetical question to the vocational expert did not include the effects of plaintiff's

6

obesity. Also, she complains that the question did not include limitations found by the State Agency doctor regarding fine and gross manipulation. She also argues that the ALJ did not state sufficient reasons for finding her to be not entirely credible in her subjective complaints. Finally, she argues that the failure of the ALJ to mention limitations on her ability to stand and walk was error, and that plaintiff should be awarded benefits now because a sit/stand option would not leave a significant number of jobs which she could perform.

With regard to the argument regarding obesity, the ALJ did find that the plaintiff's obesity was a severe impairment. He noted in his hearing decision the several references by physicians, such as Dr. Fritzhand, to the problems presented by plaintiff's obesity in determining such things as spinal curvature. Dr. Fritzhand did note that plaintiff ambulated with a normal gait (Tr. 287). However, other than possibly contributing to the need for sit/stand option alluded to in counsel's cross-examination of the VE, plaintiff does not suggest other ways her obesity would figure into a question to the VE and the number of jobs she could perform. The ALJ did not err in his evaluation of the impact of the plaintiff's obesity on her residual functional capacity.

As for fine and gross manipulation, it is true that the State Agency doctor opined that plaintiff was limited as to both (Tr. 293). However, Dr. Fritzhand, who actually examined the plaintiff, found her manipulative ability to be normal in both hands (Tr. 281-86). The ALJ did address gripping and grasping in his hypothetical. The Court finds substantial evidence to support the ALJ's RFC regarding plaintiff's manipulative ability.

As for credibility, regarding her subjective complaints, the ALJ found plaintiff to have several severe impairments, and discussed them in great detail. He cited and gave great

7

weight to the findings of Dr. Fritzhand regarding plaintiff's ranges of motion and other observations. He carefully discussed the findings of various objective tests administered by her treating physicians, and the treatment given by them for her conditions. He noted her daily activities. It is the duty of the ALJ to determine a claimant's credibility, and it must not be taken lightly by a reviewing court. *See, Jones v. Commissioner of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).

Plaintiff does, however, present a serious argument with regards to the absence of a restriction on standing and walking in the RFC finding and in the hypothetical to VE regarding jobs at the light level. In all fairness, the RFC and the hypothetical question to the VE presume that the plaintiff can perform the standing and walking requirements of light work. According to *SSR 83-14*, "[t]he major difference between sedentary and light work is that most light jobs–particularly those at the unskilled level of complexity–reacquire a person to be standing or walking most of the workday....Any limitation on those functional abilities must be very carefully to determine its impact on the size of the remaining occupational base of a person who is otherwise found functionally capable of light work."

The Commissioner counters this argument by stating that the ALJ found no restriction on standing or walking ,[1] and cites Dr. Fritzhand to support the ALJ's finding that she had no restrictions in that area. However, Dr. Fritzhand did not clarify matters in the least. He said "the claimant appears to be capable of performing a moderate amount of ... ambulating...". (Tr. 287). What does a "moderate" amount mean? It certainly does not conjure up an notion of being able to ambulate "most of the workday." Virtually all medical

---

[1] Which is rather the point of plaintiff's argument.

assessments contain an assessment of the number of hours the individual can stand and walk. For example, Dr. Bolz, the State Agency physician, opined that the plaintiff could only stand or walk 4 hours in an 8 hour workday (Tr. 291-92). Other than Dr. Fritzhand's "moderate" ambulation opinion and that of Dr. Bolz, there are no other opinions on the amount of standing and walking the plaintiff can perform.

The hypothetical question asked of the VE, which included the ability to do "light work" could only have been interpreted by the VE as meaning the plaintiff could do all the standing and walking necessary for light work. In the opinion of the Court, the medical records do not support the ALJ's finding that she could perform that basic requirement of simple, unskilled light work.

However, the Court does not find that dispositive of this case. The ALJ went on to inquire of the VE about what sedentary jobs a person could perform. Sedentary work involves mainly sitting with a certain amount of walking as necessary to carry out job duties. *See,* 20 CFR § 404.1567(a). At the sedentary level, with the other limitations set forth in the ALJ's hypothetical, the VE opined that there were a total of 265 jobs in the region, and 155,000 in the nation which the plaintiff could perform.

That is a low number of jobs. However, § 404.1566 requires the Commissioner to show that a "significant" number of jobs exist which the claimant can perform with his or her age, education, work experience and residual functional capacity. In *Stewart v. Sullivan*, 1990 WL 75248 (6th Cir. 1990), the Sixth Circuit held that 125 regional jobs and 400,000 national jobs constituted a significant number of jobs. In *Bradley v. Comm. of Soc. Sec.*, 2002 WL 1611471, the Sixth Circuit held 1,150 regional and 170,000 national jobs satisfied

9

the regulations.

In the opinion of the Court, based upon these and other Sixth Circuit precedent, the Commissioner has met his burden of showing that there are a significant number of jobs the plaintiff can perform. If 125 regional jobs in *Stewart*, and 170,000 national jobs in *Bradley* constituted a significant number, this Court cannot say that 265 regional and 155,000 national jobs identified by the VE in this case do not constitute a significant number.

There is substantial evidence to support the ALJ's ultimate finding that there are a significant number of jobs the plaintiff can perform and that she is not disabled under applicable law. Accordingly, it is respectfully recommended that the plaintiff's Motion for Judgment on the Pleadings [Doc. 12] be DENIED, and the defendant Commissioner's Motion for Summary Judgment [Doc. 14] be GRANTED.[2]

Respectfully submitted:

  s/ Dennis H. Inman
United States Magistrate Judge

---

[2] Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).